UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

|  |  |  |
|---|---|---|
| RICKY LEE McCLINTON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 5:03-cv-131 |
| | ) | |
| v. | ) | Honorable Richard Alan Enslen |
| | ) | |
| PAUL RENICO, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  After a jury trial, Petitioner was convicted of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, in the Calhoun County Circuit Court.  On December 7, 2000, the court sentenced Petitioner as a third habitual offender to consecutive prison terms of thirty-eight to sixty years for the assault with intent to murder conviction and two years for the felony-firearm conviction. (Sentencing Tr., 16, 18, Dec. 7, 2000, docket #35.)  In his *pro se* petition,[1] Petitioner raises the following seven grounds for relief:

> I.  Petitioner was denied his right to effective assistance of counsel and a fair trial when counsel failed to move for a mistrial because a police officer testified about meeting with Petitioner and his wife after a domestic assault call and volunteered information that he had been dispatched to their residence numerous times in the past.

---

[1] Petitioner submitted three briefs in support of his habeas petition: Br. in Supp. of Compl. for Writ of Habeas Corpus (docket #2); Supplemental Br. in Supp. of Pet. for Writ of Habeas Corpus (docket #2) and Supplemental Br. in Supp. of Writ of Habeas Corpus (docket #18).

II.     Petitioner was denied his right to a fair trial when the trial court permitted a police witness to testify that Petitioner was the shooter.

III.    Petitioner was denied his right to due process because of the cumulative effect of errors throughout the trial.

IV.     Petitioner was denied his right to the effective assistance of trial counsel when counsel failed to move for a continuance to obtain an analysis of blood found in his home.

V.      Petitioner was denied his right to the effective assistance of trial counsel when counsel failed to present a substantial defense and possible theory of his innocence.

VI.     Petitioner was denied his right to due process and the effective assistance of trial counsel when the trial court allowed a jury instruction that permitted the jury to consider Petitioner's failure to testify.

VII.    Petitioner was denied his right to due process and the effective assistance of trial counsel when counsel failed to call an exculpatory witness.

Respondent filed an answer to the petition (docket #22) and a supplemental answer (docket #40) stating that Petitioner's grounds for habeas relief should be denied. Upon review and applying the Antiterrorism and Effective Death Penalty Act standards, I find that Petitioner's grounds for habeas relief are without merit. Accordingly, I recommend that the petition be denied.

**<u>Procedural History</u>**

**A.      Trial Court Proceedings**

The state prosecution arose from Petitioner's alleged shooting of his wife, Patricia McClinton, in Battle Creek, Michigan, in the early morning hours of July 8, 2000. Petitioner was charged with assault with intent to commit murder, possession of a firearm during the commission of a felony, and possession with intent to deliver less than fifty grams of cocaine. On October 17, 19, and 20, 2000, the Calhoun County Circuit Court tried Petitioner before a jury.

- 2 -

Ms. McClinton testified that she has been married to Petitioner for three years. (Trial Tr. vol. I, 99, Oct. 17, 2000.)   They have a two-year old son.  (Tr. I, 99.)  Ms. McClinton also has a twelve-year old son.  (Tr. I, 100.)  The McClintons lived at 204 North Wood Street.  (Tr. I, 99-100.)  Around 2:00 a.m. on July 8, 2000, Ms. McClinton called 9-1-1 after arguing with Petitioner. (Tr. I, 100, 123.)  When the police arrived, Petitioner agreed to leave, but he ultimately stayed at the residence because Ms. McClinton decided to leave.  (Tr. I, 100-01, 123.)  Ms. McClinton had contacted her sister to pick her up at the residence.  (Tr. I, 100, 123.)  After awhile, Ms. McClinton told the police that they were no longer needed.  (Tr. I, 101.)  Neither Ms. McClinton nor Petitioner, however, left the home.  (Tr. I, 101.)

Ms. McClinton testified that Petitioner was drunk and high.  (Tr. I, 101-02.)  After the police left, Petitioner sat in a loveseat to talk with Ms. McClinton, who was sitting on a couch. (Tr. I, 103.)  Soon thereafter, Petitioner mentioned that "he was going to get the gun and look at it." (Tr. I, 104.)  Petitioner stored the gun behind the loveseat.  (Tr. I, 104.)  Ms. McClinton threatened to call the police if Petitioner retrieved the gun.  (Tr. I, 105.)  At this time, Ms. McClinton started walking toward the front door and dialing 9-1-1 with a cordless phone.  (Tr. I, 105-06.)  Petitioner stated that he would kill Ms. McClinton if the police answered.  (Tr. I, 107.)  Initially, Ms. McClinton testified that she could not see Petitioner after she started walking towards the front door. (Tr. I, 106-07.)   The prosecutor, however, impeached Ms. McClinton's testimony with her statements from the preliminary examination, where she testified that Petitioner was standing behind her with the gun.  (Tr. I, 107-09.)  As soon as the 9-1-1 operator answered, Ms. McClinton was shot in the arm.  (Tr. I, 110-11.)  As a result, she dropped the phone.  (Tr. I, 110-11.)  The second bullet hit her in the hip and she fell to the ground.  (Tr. I, 111.)  The third bullet entered her back near the

- 3 -

shoulder blade.  (Tr. I, 111, 125-26.)  That bullet traveled into her breast and down into her stomach.

(Tr. I, 126-27.)  While on the ground, Ms. McClinton was shot twice in the leg.  (Tr. I, 111.)

Because Ms. McClinton was on the phone with the 9-1-1 operator during the shooting, the

prosecutor played a tape of the 9-1-1 conversation between Ms. McClinton and the 9-1-1 operator

at trial.  (Tr. I, 111-14.)  Though the 9-1-1 conversation was not transcribed, Ms. McClinton

apparently told the 9-1-1 operator that Petitioner was the shooter.  (*See* Br. in Supp. of Compl. for

Writ of Habeas Corpus, 2, docket #2.)  After the shooting, Ms. McClinton noticed that Petitioner had

left the house.  (Tr. I, 114-15.)

Both of Ms. McClinton's sons were sleeping at the time of the shooting.  (Tr. I, 115.)

After the shooting, Ms. McClinton called her twelve-year old son to help her because she did not

want to pass out.  (Tr. I, 115.)  At that time, her son noticed that their car was gone.  (Tr. I, 115.)

Eventually, an ambulance drove Ms. McClinton to the hospital.  (Tr. I, 116.)  At 7:00 a.m., doctors

operated on Ms. McClinton's right arm.  (Tr. I, 116.)  The doctors placed a metal plate with eleven

screws in her arm.  (Tr. I, 119.)  On July 31, 2000, doctors also removed a bullet from Ms.

McClinton's stomach. (Tr. I, 117.)  Due to her wounds, Ms. McClinton received extensive physical

therapy.  (Tr. I, 121.)

Ms. McClinton testified that the gun admitted into evidence looked like the gun from

her house.  (Tr. I, 125.)  She also testified that she did not know anything about the cocaine, which

was found in her home.  (Tr. I, 122.)

Mr. Andrew Horn testified that he is an officer with the City of Battle Creek Police

Department.   (Trial Tr. vol. II, 5, Oct.19, 2000.)  He was on duty the morning of July 8 when he

received a dispatch to the McClinton's home at approximately 2:30 a.m. (Tr. II, 5-6, 24.)  Officer

- 4 -

Horn arrived at the residence shortly after Battle Creek Police Officer Doug Graham.  (Tr. II, 6.)  The McClintons had a verbal disagreement.  (Tr. II, 6.)  Officers Horn and Graham met with Petitioner and Ms. McClinton who both stated that they did not need any assistance, as Ms. McClinton would be leaving soon.  (Tr. II, 6-7.)  Officers Horn and Graham then waited outside for approximately ten to twenty minutes for Ms. McClinton to leave.  (Tr. II, 7, 24.)  When she did not leave, they checked on Ms. McClinton but she told Officers Horn and Graham that they were no longer needed.  (Tr. II, 8.)  Officer Horn also testified that he had been called to the McClinton's residence "numerous times before."  (Tr. II, 7.)

After leaving the McClinton's residence, Officers Horn and Graham then drove approximately a block to a church parking lot to talk.  (Tr. II, 9.)  Officer Horn faced east in his patrol car and Officer Graham faced west in his patrol car.  (Tr. II, 10.)  At 2:55 a.m., the dispatcher sent Officers Horn and Graham to 204 North Wood Street, the McClinton's house, because someone had been shot.  (Tr. II, 9-10, 24.)  Almost simultaneously, Officer Horn recognized Petitioner's car traveling southbound on North Wood Street.  (Tr. II, 10.)   Officer Horn instructed Officer Graham to go to the house while he followed Petitioner's car.  (Tr. II, 10.)   Officer Horn trailed Petitioner until Petitioner pulled into 39 Summerset.  (Tr. II, 16-17.)  At that time, Officer Horn heard Officer Graham excitedly yell over the radio, "I've got a woman shot in the house.  Get me some medical personnel here, immediately."  (Tr. II, 17.)  As Petitioner exited his vehicle, Officer Horn produced his firearm because he thought Petitioner might be armed and shoot him.  (Tr. II, 17.)  He yelled for Petitioner to stop and put his hands up.  (Tr. II, 20.)  Petitioner failed to comply and started yelling for Officer Horn to shoot him.  (Tr. II, 20, 27.)  He also yelled for his mother, who apparently was inside the house at 39 Summerset.  (Tr. II, 20.)  Eventually, an elderly woman appeared at the front

- 5 -

door.  (Tr. II, 20.)  Petitioner then told her, "I shot a mother-fucker."  (Tr. II, 20-21.)  Officer Horn eventually arrested Petitioner. (Tr. II, 21-22.)  Upon inspecting Petitioner's car, Officer Horn noted that the right passenger window was lowered.  (Tr. II, 22-23.)

Battle Creek Police Officer Doug Graham corroborated Officer Horn's testimony. (Tr. II, 48-61.)  When Officer Graham returned to Ms. McClinton's home after the second dispatch, he found her sitting in the doorway, on the phone, covered in blood.  (Tr. II, 54.)  She was screaming, "he shot me.  He shot me."  (Tr. II, 54.)  Officer Graham asked, "who shot you?"  (Tr. II, 54.)  Ms. McClinton said, "Ricky shot me."  (Tr. II, 54.)  He then advised Officer Horn that Ms. McClinton had been shot.  (Tr. II, 54.)  He also called for an ambulance.  (Tr. II, 54.)  For their safety, Officer Horn asked Ms. McClinton whether anyone else was in the house.  (Tr. II, 55.)  She replied that only her children were in the house.  (Tr. II, 55.)

After the ambulance drove Ms. McClinton away, Officer Graham looked for shell casings in the house, to no avail.  (Tr. II, 56-57.)  Officer Graham ultimately concluded that the weapon used in the shooting must have been a revolver because shell casings are stored in a revolver after they are fired.  (Tr. II, 57, 60.)  He also identified the gun admitted into evidence as a revolver. (Tr. II, 57.)

Battle Creek Police Officer Todd Madsen testified that he also failed to find shell casings in the house.  (Tr. II, 101.)  During the course of his search, however, he uncovered a bag of crack cocaine behind an entertainment center.  (Tr. II, 101.)

Officer Ken Millikin is also employed by the City of Battle Creek Police Department. (Tr. II, 62.)  After hearing radio traffic regarding Petitioner, Officer Millikin caught up with Officer Horn at 39 Summerset.  (Tr. II, 62-63.)  Officer Millikin checked Petitioner's vehicle for weapons.

(Tr. II, 63.)  When he failed to find any weapons inside the vehicle, Officer Millikin backtracked the route Officer Horn had traveled.  (Tr. II, 63.)  Officer Millikin eventually located a gun on that route.  (Tr. II, 64.)  He also observed shell casings inside the gun.  (Tr. II, 65.)

Battle Creek Police Officer Michael McKenzie testified that he traveled to the hospital to assist Ms. McClinton.  (Tr. II, 138.)  While at the hospital, Ms. McClinton, visibly upset and in pain, uttered "I didn't think he was going to shoot me.  He is my husband."  (Tr. II, 139, 144).

Dr. Raakesh Bhan testified as an expert in critical care medicine.  (Tr. II, 31.)  He examined Ms. McClinton's injuries on July 8.   (Tr. II, 32-33.)  He also found the presence of marijuana and opiates in her system.  (Tr. II, 38.)  Dr. Bhan noted several gunshot wounds to Ms. McClinton's body. (Tr. II, 33.)  One bullet entered her right elbow near a major artery and fractured the bone.  (Tr. II, 33.)  That injury required surgery.   (Tr. II, 33.)  Because of bleeding during and after surgery to her elbow, Ms. McClinton needed a blood transfusion on July 9.  (Tr. II, 34-35, 43.)  Dr. Bhan also examined a gunshot wound to her chest wall and abdomen, which fractured a rib and came close to her lung and internal organs.  (Tr. II, 33, 36.)  Dr. Bhan ultimately opined that Ms. McClinton would have bled to death if she did not go to the hospital on July 8.  (Tr. II, 36.)  The hospital ultimately held Ms. McClinton until July 11 for observation.  (Tr. II, 38, 43-44.)

Jennifer Diepenhorst testified that she is employed as a Forensic Evidence Technician with the Battle Creek Police Department.  (Trial Tr. vol. III, 4, Oct. 20, 2000.)   She removed samples of blood from the McClinton's home but did not test any of the blood.  (Tr. II, 6-7.)  She also removed crack cocaine from the residence.  (Tr. II, 8.)  Finally, she examined the weapon recovered by Officer Millikin.  (Tr. III, 11.) Technician Diepenhorst identified the gun as a Taurus

Brazil, a five-shot revolver.  (Tr. III, 10.)   At the Crime Lab, she noted five spent cartridges inside the cylinder of the gun.  (Tr. III, 11-13.)

Stuart Burritt, a detective with the Michigan Department of State Police, testified as an expert in firearm analysis and identification.  (Tr. III, 15-17.)   Detective Burritt tested the revolver.  (Tr. III, 19-22.)   He found that a few of the recovered bullet fragments from Ms. McClinton's body came from the revolver.  (Tr. III, 24-27, 33.)   The other fragments were either too small or did not come into contact with the barrel of the weapon, so they could not be positively identified.  (Tr. III, 27-28.)  Detective Burritt also testified that the recovered bullets were the type of bullets that mushroom on impact, creating greater bodily harm.  (Tr. III, 30-31.)  Detective Burritt was the prosecution's last witness.  (Tr. III, 33.)

Inez McClinton, Petitioner's mother, testified on behalf of Petitioner. (Tr. III, 36.) She did not recall hearing Petitioner yell "Mamma, I shot a mother-fucker" although she was standing on her front porch.  (Tr. III, 37.)  She testified that her son said "Mama, get my car." (Tr. III, 37.)

### B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief and supplemental brief raised the same seven issues as are raised in his application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal & Def.-Appellant's Supp. Br. on Appeal, docket #36.) By unpublished opinion issued on January 14, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* Jan. 14, 2003 Mich. Ct. Appeal Op. (MCOA Op.), docket #36.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner submitted the same seven claims raised before and rejected by the Michigan Court of Appeals. By order entered July 28, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* July 28, 2003 Mich. Ord., docket #37.)

### C.     Habeas Corpus Proceedings

Along with his habeas petition, Petitioner submitted new affidavits from Ms. McClinton and Tina Wyrick, dated May 28, 2003 and February 19, 2002, respectively, to the Court to demonstrate his innocence. (*See* Pl.'s Exs. in Supp. of Writ Habeas Corpus, docket #3.) This evidence was not in the state court record of Petitioner's trial in 2000. Petitioner also filed a Motion to Show Cause to add Newly-Discovered Evidence for Relief from Judgment/New Trial/Acquittal (docket #10), requesting that this Court permit the newly discovered evidence to become part of the state court's record. The Court subsequently issued an Order to Show Cause (docket #13) to determine whether Petitioner intended to raise new issues in his habeas petition. In response, Petitioner asked the Court to strike any new claims but requested an evidentiary hearing. (*See* Pet.'s Reply to Order to Show Cause, docket #14.) In an Order (docket #17) dated November 3, 2003, the Court denied Petitioner's motion for an evidentiary hearing without prejudice, pending plenary review of his case. Under Rule 8(a), RULES GOVERNING § 2254 CASES IN THE DISTRICT COURT, the district court must determine whether to conduct an evidentiary hearing as to the petition after examining the record. This determination is a discretionary one. *See Harries v. Bell,* 417 F.3d 631, 635 (6th Cir. 2005). However, given the presumption of correctness attaching to the state court findings under 28 U.S.C. §2254 and the difficulty of rebutting such presumption, evidentiary

hearings are often unnecessary, as in this case. *See also Vroman v. Brigano,* 346 F.3d 598, 606 (6th Cir. 2003) Therefore, Petitioner's habeas corpus action will be determined solely on the basis of the record made in the state court.

Petitioner also appears to assert an actual innocence claim by submitting Ms. McClinton's and Ms. Wyrick's affidavits to the Court. Ms. McClinton's affidavit recants her testimony and implicates an unknown black man for the shooting. (*See* Pl.'s Exs. in Supp. of Writ Habeas Corpus, docket #3.) Ms. Wyrick's affidavit states that she was present at the McClinton's residence at the time of the shooting and Petitioner was not home. *Id.* Ms. Wyrick, however, noted the presence of another person at the house but did not "get a good look at the person." *Id.* In *Herrera v. Collins,* 506 U.S. 390, 400 (1993), the Supreme Court explicitly held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." A claim of actual innocence can only serve to excuse a procedural default so that a petitioner may bring an independent constitutional claim challenging his conviction or sentence. *Id.* at 404; *Schlup v. Delo,* 513 U.S. 298, 314-15 (1995). In this case, Petitioner does not assert actual innocence as a means to excuse a procedural default of an underlying federal claim. Rather, Petitioner's newly discovered evidence constitutes the claim itself. In *House v. Bell*, 126 S. Ct. 2064 (2006), the Supreme Court revisited and elaborated on the actual innocence exception to the procedural default rule set forth in *Schlup*, 513 U.S. at 314-15. Significantly, the *House* Court declined to answer the question left open in *Herrera,* 506 U.S. at 400, that is whether a habeas petitioner may bring a freestanding claim of actual innocence. *House,* 126 S. Ct. at 2086-87. The Court further opined that the threshold for any hypothetical freestanding innocence claim would be

"extraordinarily high," and would require more convincing proof of innocence than *Schlup*.  *Id.* at 2087.  Accordingly, Petitioner's claim of actual innocence fails.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state

- 11 -

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 317-18 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 405-07); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential

- 12 -

because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### <u>Discussion</u>

### I.      **Ineffective Assistance of Trial Counsel**

In his application for habeas relief, Petitioner asserts that his trial counsel was ineffective in a litany of ways:  (a) for failing to move for a mistrial when a police officer volunteered information that he had been dispatched to Petitioner's and Ms. McClinton's residence

numerous times in the past; (b) for failing to move for a continuance to obtain an analysis of the blood found in Petitioner's home; (c) for failing to present a substantial defense and possible theory of Petitioner's innocence; (d) for failing to object to a jury instruction, which erroneously instructed the jury to consider Petitioner's failure to testify; and (e) for failing to call Tina Wyrick, an exculpatory witness.  Petitioner also alleges due process violations in claims (d) and (e), which will be addressed in conjunction with the ineffective assistance of counsel claims.  Petitioner raised his ineffective of assistance of counsel claims for the first time before the Michigan Court of Appeals. That court found that because Petitioner had not moved for a new trial or for an evidentiary hearing, its review was limited to "errors apparent from the record."  *People v. Johnson,* 144 Mich. App. 125, 129-30.[2]

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States,* 90 F.3d 130, 134-35 (6th Cir. 1996) (holding that counsel's strategic decisions

---

[2] Petitioner moved the Michigan Court of Appeals twice for remand to the trial court to establish his ineffective assistance of counsel claims.  The Michigan Court of Appeals denied Petitioner's requests on September 14, 2001 and January 29, 2002, respectively.  The Michigan Court of Appeals also denied Petitioner's motion for reconsideration of the September 14, 2001 denial of his motion for remand.

- 14 -

were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.

A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the unreasonable application prong of § 2254(d)(1).  Under the "unreasonable application" standard, the state court identifies the correct governing legal rule from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Wiggins v. Smith,* 539 U.S. 510, 520 (2003); *Williams,* 529 U.S. at 413;  *Barnes v. Elo,* 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

### A.     Officer Horn's Testimony Regarding Multiple Police Visits

Petitioner asserts that his trial counsel was ineffective for failing to move for a mistrial after Officer Horn testified twice that the police visited the McClinton's residence on numerous occasions prior to July 8, 2000.  (*See* Tr. II, 7, 10.)  Specifically, Officer Horn stated that he had been called to the McClinton's residence "numerous times before, and on this date, we decided to stay outside so that if there were any more problems, that we would be right there . . . ." (Tr. II, 7.)  In the second instance, Officer Horn testified that he recognized Petitioner's vehicle on North Wood Street after the shooting.  (Tr. II, 10.)  "To be quite honest with you, I thought that was

rather strange because on previous contacts . . . ." (Tr. II, 10.)  The prosecutor, however, interrupted Officer Horn so he could not proceed any further.

Regarding Petitioner's ineffective assistance of trial counsel  claim, the Michigan Court of Appeals held as follows:

> Defendant first argues that defense counsel erred by failing to move for a mistrial after Officer Horn testified that the police had been in contact with defendant and Patricia on several occasions in the past. Horn's remarks did not implicate defendant in any crime, nor did they necessarily lead the jury to conclude that he had previously engaged in prior bad acts or domestic violence. Instead, the remarks merely explained the officers' continued presence near the residence. Therefore, any motion for a mistrial would not have been granted. Counsel is not required to advocate a meritless position. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000).

MCOA Op. at *2.

Here, the Michigan Court of Appeals did not unreasonably apply *Strickland* in assessing Petitioner's ineffective assistance of counsel claim.  When deciding ineffective assistance of counsel claims, "courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697. Petitioner fails to satisfy the prejudice prong of the *Strickland* test in light of the overwhelming evidence of his guilt.  To satisfy the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *accord Nix v. Whiteside,* 475 U.S. 157, 175 (1986); *Mallett v. United*

- 16 -

*States,* 334 F.3d 491, 497 (6th Cir. 2003); *Bugh v. Mitchell,* 329 F.3d 496, 514-15 (6th Cir. 2003).

Where "one is left with pure speculation on whether the outcome of the trial or the penalty phase

could have been any different," there is an insufficient showing of prejudice. *Baze v. Parker,* 371

F.3d 310, 322 (6th Cir. 2004).

Ms. McClinton testified that she called 9-1-1 during a verbal disagreement with

Petitioner in the early morning hours of July 8, 2000. (Tr. I, 100, 123.)  Officers Horn and Graham

answered the dispatch, but left ten to twenty minutes later at the request of Ms. McClinton.  (Tr. II,

6-8, 24.)  Soon thereafter, Petitioner mentioned to Ms. McClinton that "he was going to get the gun

and look at it." (Tr. I, 104.)  Ms. McClinton threatened to call the police again if Petitioner retrieved

the gun. (Tr. I, 105.)  Ms. McClinton then started walking toward the front door, while calling 9-1-1

on a cordless phone.   (Tr. I, 105-06.)  Petitioner told her that he would kill her if the police

answered.  (Tr. I, 107.)  Once the 9-1-1 operator answered, Ms. McClinton was shot in the arm, hip,

back and twice in the leg.  (Tr. I, 110-11.)  Initially, Ms. McClinton testified that she did not see

Petitioner behind her. (Tr. I, 106-07.)  The prosecutor, however,  impeached her testimony with her

statements from the preliminary examination testimony, where she testified that Petitioner was

standing behind her with the gun. (Tr. I, 107-09.)  Ms. McClinton also apparently told the 9-1-1

operator that Petitioner was the shooter.  (*See* Br. in Supp. of Compl. for Writ of Habeas Corpus, 2,

docket #2.)  After the shooting, Ms. McClinton noticed that Petitioner had left the house.  (Tr. I, 114-

15.)

At 2:55 a.m., Officers Horn and Graham again answered a dispatch to 204 North

Wood Street, the McClinton's house.  (Tr. II, 9-10, 24.)  The dispatcher stated that someone had

been shot.  (Tr. II, 9-10, 24.)  Almost simultaneously, Officer Horn recognized Petitioner's car

traveling southbound on North Wood Street.  (Tr. II, 10.)   Officer Horn instructed Officer Graham to go to the house while he followed Petitioner's car.  (Tr. II, 10.)   Petitioner eventually pulled into the driveway of his mother's house.  (Tr. II, 17.)   At that time, Officer Horn heard Officer Graham yell over the radio, "I've got a woman shot in the house.  Get me some medical personnel here, immediately."  (Tr. II, 17.)   Petitioner exited his vehicle, yelled for his mother, stating, "I shot a mother-fucker."  (Tr. II, 20-21.)

When Officer Graham returned to Ms. McClinton's home after the second dispatch, he found her sitting in the doorway, on the phone, covered in blood.  (Tr. II, 54.)   She was screaming, "he shot me.  He shot me."  (Tr. II, 54.)   Officer Graham asked, "who shot you?"  (Tr. II, 54.)   Ms. McClinton said, "Ricky shot me."  (Tr. II, 54.)   Officer Michael McKenzie also testified that at the hospital Ms. McClinton identified Petitioner as her assailant.  (Tr. II, 144.)

After retracing Officer Horn's route pursuing Petitioner, Officer Ken Millikin found a gun with five spent shell casings in the revolver.  (Tr. II, 64-65.)   The gun was eventually linked to bullet fragments obtained from Ms. McClinton's body by Detective Stuart Burritt.  (Tr. III, 24-27, 33.)   Dr. Rakeesh Bhan also testified that Ms. McClinton would have bled to death if she had not been treated at the hospital for her injuries.  (Tr. II, 36.)

Given this evidence, there is no reasonable probability that Petitioner would have been acquitted on his convictions for assault with intent to commit murder and possession of a firearm during the commission of a felony.  Accordingly, the Michigan Court of Appeal's decision did not result in an objectively unreasonable application of the *Strickland* standard.

### B.       Blood Analysis

Petitioner asserts that his trial counsel was ineffective for failing to move for a continuance to test the blood found in Petitioner's home.  While Technician Jennifer Diepenhorst removed  samples of blood from a wall and the front door of the McClinton's residence, she did not test any of the blood.  (Tr. II, 6-7.)  Petitioner argues that he does not know who shot his wife and the blood may have belonged to the person who shot her.  (*See* Suppl. Br. in Supp. of Pet. for Habeas Corpus, 3, docket #2.)  The Michigan Court of Appeals addressed the argument as follows:

> Defendant next argues that defense counsel's failure to move for a continuance in order to test bloodstains found at the crime scene deprived defendant of the substantial defense that he did not shoot his wife. There is nothing in the record to suggest that the blood belonged to anyone other than [Ms. McClinton], and because this crime involved a shooting there is no reason to believe that the perpetrator's blood would be found at the scene. Nothing in the record indicates that the results of the blood test would have exonerated defendant. Counsel is not required to advocate a meritless position. *Snider*, *supra* at 425.

MCOA Op. at *2.

This Court concludes that the Michigan Court of Appeals' decision is not an unreasonable application of *Strickland*.  Petitioner's argument is meritless.  As the Michigan Court of Appeals concluded, there is no reason to believe that the  blood would have been anyone's but Ms. McClinton's. The evidence from the trial does not suggest that there was anyone else present at the McClinton's residence at the time of the shooting besides Petitioner, Ms. McClinton, and her two sons.  (*See* Tr. I, 114-15; Tr. II, 55.)  Further, there is no evidence that anyone besides Ms. McClinton was shot or injured.  As counsel is not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel,  *Norris v. Schotten*, 146 F.3d 314, 336 (6th Cir. 1998), counsel was not ineffective for failing to move for a continuance for an analysis of the blood in the

McClinton's residence.  Further, as provided in Section I(A), Petitioner failed the prejudice prong of the *Strickland* test.  Ms. McClinton, at various times, stated that Petitioner shot her, *i.e.* during the second 9-1-1 call, immediately after the shooting to Officer Graham, and at the hospital to Officer McKenzie.  *(See* Br. in Supp. of Compl. for Writ of Habeas Corpus, 2, docket #2; Tr. II, 54, 144.)  Therefore, Petitioner's ineffective assistance of counsel claim fails.

###### C.    Failure to Present a Defense

Petitioner argues that trial counsel was ineffective for failing to present a defense.  Specifically, Petitioner argues that trial counsel only relied upon the weaknesses of the prosecution's case, similar to the trial counsel in *Matthews v. Abramajtys,* 319 F.3d 780 (6th Cir. 2003); failed to argue Petitioner's claim of innocence; failed to investigate and call Tina Wyrick as a defense witness; and failed to analyze the bloodstains in his house.  With respect to Petitioner's claim that trial counsel was ineffective for failing to present a substantial defense, the Michigan Court of Appeals held:

> Defendant next asserts that he was denied a substantial defense by defense counsel's failure to argue that defendant was not the shooter. A defendant is entitled to have his attorney prepare, investigate, and assert all substantial defenses. *In re Ayres,* 239 Mich App 8, 22; 608 NW2d 132 (1999). A substantial defense is one that may have made a difference in the outcome of the trial. *Id.* In the present case, defendant provides no evidence to support his contention that someone else was in the house on the night of the shooting, nor is there any evidence in the record that there was anybody else in the house. Further, defendant's own wife identified him as the shooter both during the 911 call and immediately thereafter. Defendant has failed to so demonstrate that he was denied a substantial defense.

MCOA Op. at *2.

Decisions as to whether to call certain witnesses or what evidence to present are presumed to be a matter of trial strategy, and the failure to call witnesses or present evidence

constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden v. Kapture,* 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell,* 303 F.3d 720, 749 (6th Cir. 2002). A defense is substantial if it might have made a difference in the outcome of the trial. *Matthews,* 319 F.3d at 790 (citing *Strickland,* 466 U.S. at 693-96). Petitioner failed to rebut this presumption. Petitioner cites *Matthews,* 319 F.3d at 789-90, to support his claim that counsel must do something more than poke holes in the prosecution's case. In *Matthews,* the Sixth Circuit held that the petitioner's trial counsel met the standard for incompetence because he failed to present alibi witnesses or evidence to assist his client, hence only occupying "space next to his client." Further, the evidence in *Matthews* was not so overwhelming against the defendant that there was reasonable probability of a different outcome with effective counsel. *Id.* Unlike *Matthews,* the evidence in this case is overwhelming. *See* Section I(A). Further, counsel presented a witness for Petitioner, his mother. (*See* Tr. III, 36-38.) Counsel also argued that Petitioner lacked the specific intent to kill because none of the shots were aimed at Ms. McClinton's head or heart. (Tr. II, 49.) Given the fact that Ms. McClinton implicated Petitioner in the shooting multiple times, counsel's performance fell within the wide range of reasonable professional assistance. (*See* Br. in Supp. of Compl. For Writ of Habeas Corpus, 2, docket #2; Tr. II, 54, 144.)

Petitioner also asserts that his counsel's failure to investigate and call Ms. Wyrick as a defense witness denied him a substantial defense. Petitioner, however, fails to state why Ms. Wyrick was not called as a witness or whether defense counsel was even aware of Ms. Wyrick's potential testimony. Ms. Wyrick is not even mentioned in the trial record. As stated in Section I(E), this claim fails to satisfy the *Strickland* test. Likewise, Petitioner's claim that counsel should have tested the bloodstains in his home fails the *Strickland* standard for the reasons provided in Section

I(B).  Because the evidence against Petitioner was so strong, Petitioner's alleged lack of defense by trial counsel would not have affected the outcome of the trial.  Having reviewed the record, this Court cannot conclude that the Michigan Court of Appeals' decision was an unreasonable application of *Strickland*.

### D.      Failure to Object to a Jury Instruction

Petitioner claims that he was denied the effective assistance of trial counsel and due process when trial counsel failed to object to a jury instruction that implied that the jury should consider the fact that Petitioner failed to testify.  In his habeas brief, Petitioner also asserts a Fifth Amendment claim against compelled self incrimination.  (*See* Br. in Supp. of Compl. For Writ of Habeas Corpus, 21, docket #2.)  The trial court provided the following instruction to the jury: "[e]very Defendant has the absolute right not to testify.  When you decide the case, you *must consider* the fact that he did not testify.  It must not affect your verdict in any way."  (Tr. III, 57.) (emphasis added.)  The Michigan Court of Appeals addressed the argument as follows:

> Defendant also contends that defense counsel failed to object when the trial court instructed the jury that "you *must* consider the fact that defendant did not testify" [emphasis added].  Whether the jury instruction was erroneous as given to the jury, or whether the transcriptionist merely made an error is unknown to this Court. There is some debate as to whether this was actually what the trial court said. If the error was in the transcription, and the jury was given the proper instruction, then this issue is moot. However, even if the error was in the instruction, defendant has failed to persuade us that this error affected the outcome of the trial. The evidence against defendant was overwhelming, and defendant has not explained how the consideration by the jury of defendant's failure to testify would have impacted the verdict.

MCOA Op. at *2.

Petitioner cites the district court's decision in *Hardaway v. Withrow,* 147 F. Supp.2d 697, 711-12 (E.D. Mich. 2001), *rev'd,*305 F.3d 558 (6th Cir. 2002), in support of his ineffective assistance of counsel claim.   However, Petitioner's reliance on the district court's decision is misplaced.   In *Hardaway,* the petitioner argued that he was denied his due process rights when the judge sent an *involuntary* manslaughter instruction to the jury instead of the correct *voluntary* manslaughter instruction after the jury requested a clarification on the law of manslaughter.   *Hardaway,* 305 F.3d at 563-64.   The district court granted habeas relief as to that claim, but the Sixth Circuit Court of Appeals reversed its decision.   *See id.* at 565. The Sixth Circuit ultimately denied habeas relief by adopting the factual finding of the Michigan Court of Appeals, which held that notwithstanding the transcript, the trial judge had not given the jury a new and different instruction on manslaughter.   *Id.* at 564.   In the present case, the Michigan Court of Appeals failed to make any specific factual finding regarding the jury instruction on Petitioner's failure to testify.   Rather, the state appellate court found that the evidence against Petitioner was overwhelming.   *See* MCOA Op. at *2.   Moreover, the appellate court stated that Petitioner failed to explain how the jury's consideration of his failure to testify would have impacted the verdict.   *Id.*

The decision of the Michigan Court of Appeals was a reasonable application of established Supreme Court precedent.   A jury instruction may not be judged in isolation but must be considered in the context of the instructions as a whole, together with the trial court record. *Hardaway,* 305 F.3d at 565.   Considering the context of the jury instructions in the trial record, the judge's error in the instructions did not effect the outcome of Petitioner's trial.   In his jury instructions, the judge noted that every defendant has the absolute right not to testify, and, that right must not effect the verdict in anyway.   (Tr. III, 57.)   During opening statements to the jury panel, the

- 23 -

judge also forewarned the jury that he would be giving them an instruction at the end of the trial, which provided that Petitioner has the absolute right to remain silent.

> THE COURT:   So in this case, the [Petitioner] may choose not to testify, and if that happens, at the end of the trial, I would give you an instruction which specifically says, in essence, you can't hold that against him; that he has the absolute right to remain silent.  You can't hold that against him, in any fashion, as you decide - deliberate and decide the facts in the case and determine whether or not the Prosecution has proven their case beyond a reasonable doubt.  So, if the [Petitioner] chooses not to testify, and I give you that instruction, can you ensure us that you will follow that instruction?
>
> JURY PANEL: Yes.

(Tr. I, 9-10.)  Petitioner's attorney also asked the jury panel during *voire dire* whether any of them would hold Petitioner's right not to testify against him.  The jury panel responded "no."  (Tr. I, 33.)  Further, Petitioner cannot affirmatively demonstrate that but for his counsel's error in failing to object to the jury instruction, the outcome of his case would have been different considering the overwhelming evidence summarized in Section I(A).  Therefore, Petitioner's ineffective assistance of counsel claim fails.

Petitioner also asserts a due process violation with respect to the erroneous jury instruction.  "To warrant habeas relief, the jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair."  *Hardaway,* 305 F.3d at 565 (citing *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)).  To warrant issuance of the writ, the defective jury instructions, viewed in the context of the trial record, must have had a substantial and injurious effect or influence on the verdict.  *Id.*  As explained above, the jury instruction, viewed in context, failed to have a substantial effect on the verdict.  Except for the erroneous statement, the judge repeatedly told the jury not to consider Petitioner's decision not to testify.  Further, Petitioner failed to explain how the jury's consideration of his failure to testify

would have impacted the verdict. *See* MCOA Op. at *2. Therefore, Petitioner's due process claim also fails.

Finally, Petitioner argues that the trial court's instruction violated his Fifth Amendment right against compelled self-incrimination, applicable to the States through the Fourteenth Amendment. A defendant in a criminal case has a constitutional right against compelled self-incrimination. U.S. CONST., AMEND. V. To effectuate this right, a prosecutor may not make any reference to or comment upon a defendant's failure to testify and the court may not instruct the jury that such silence is evidence of guilt. *Griffin v. California*, 380 U.S. 609, 615 (1965). Constitutional error requires reversal only if it is not harmless. *Penry v. Johnson*, 532 U.S. 782, 784 (2001). In order for this Court to find that the admission of this evidence was not harmless, we must find that the trial court's error had "a substantial and injurious effect or influence in determining the jury's verdict." *Penry*, 532 U.S. at 784; *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999). In light of the evidence of Petitioner's guilt, I cannot find that the erroneous instruction by the trial judge had a substantial or injurious effect or influence on the jury's verdict.

### E.    Failure to Call Defense Witness

Lastly, Petitioner argues that he was denied the effective assistance of trial counsel and due process for counsel's failure to call Tina Wyrick as a defense witness. The trial record does not indicate why Ms. Wyrick was not called as a witness. In fact, the trial record does not even mention Ms. Wyrick. The Michigan Court of Appeals refused to consider Petitioner's claim, finding:

> Defendant's final argument with respect to ineffective assistance of counsel is that defense counsel should have presented the testimony of Tina Wyrick. The existing record contains no mention of Tina Wyrick and, therefore, does not permit review of this argument.[3]

MCOA Op. at *2-3. As explained in Section I(C), the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden,* 92 F. App'x at 311; *Hutchison,* 303 F.3d at749. This Court previously concluded that the trial counsel's alleged failure to call Ms. Wyrick did not deprive Petitioner of a substantial defense because the evidence against Petitioner was overwhelming. *See* Section I(A) & (C). Therefore, Petitioner's ineffective assistance of counsel claim fails. Without an ineffective assistance of counsel claim, the failure to call Ms. Wyrick as a witness does not result in a fundamentally unfair trial. *See Hardaway,* 305 F.3d at 565 (citing *Scott,* 209 F.3d at 882). Accordingly, Petitioner's due process claim also fails.

## II.    Evidentiary Errors

Petitioner contends that his due process rights were violated when the trial court permitted Officer Horn to testify "that he believed [Petitioner] was the shooter." (Br. in Supp. of Compl. for Writ of Habeas Corpus, 14, docket #2.) During his direct examination of Officer Horn, the prosecutor questioned Officer Horn regarding his encounter with Petitioner after the shooting. (Tr. II, 17.) Officer Horn followed Petitioner's car until it stopped at his mother's house on 39 Summerset. (Tr. II, 17.) The following exchange occurred:

> Q:    At that point, where Mr. McClinton pulls into 39 Summerset, what takes place?

---

[3] Defendant has attached to his appellate brief an affidavit from Wyrick. However, the court may not consider the proposed testimony contained in the affidavit because, generally, this Court's review is limited to the record of the trial court or administrative tribunal, *Amorello v Monsanto Corp,* 186 Mich App 324, 330; 463 NW2d 487 (1990).

A:    Well, at this point, right as he is pulling over is when I heard Officer Graham say, "I've got a woman shot in the house. Get me some medical personnel here, immediately," and his voice was very excited, and I knew something, obviously, was very wrong.  When I exited - as he said that, that is when we about came to a complete stop.  I exited my patrol car.  Mr. McClinton exited his vehicle.  I produced my firearm at him, and at this point, you know, believed him to be armed, and figured if he was willing to shoot his wife, -

[Defense Counsel]:    Your honor, -

The Witness:  - he would shoot me.

[Defense Counsel]:    - I would object.  The Officer is kind of telling a little . . . He's kind of projecting his own opinion.

The Court:    It's kind of a state-of mind thing, but you can go ahead with your questions.

(Tr. II, 17.)  In rejecting Petitioner's claim, the Michigan Court of Appeals stated:

Defendant contends that the trial court abused its discretion when it allowed Horn to express his personal opinion that defendant was the shooter. Contrary to defendant's assertion, Horn's testimony that he drew his weapon when effectuating defendant's arrest because he believed that if defendant "was willing to shoot his wife, he would shoot me" did not constitute an opinion concerning defendant's guilt, but rather explained his actions on the night of the crime. We find no abuse of discretion in the trial court's decision to admit this evidence. *People v Starr,* 457 Mich 490, 494; 577 NW2d 673 (1998).

MCOA Op. at 3.

Petitioner asserts a violation of his federal due process rights for the trial court's admission of Officer Horn's testimony.  He cites *United States v. Young,* 470 U.S. 1 (1985) for the proposition that prosecutors and police officers are forbidden from informing the jury that they believe the defendant is guilty.  In *Young,* the Supreme Court upheld a conviction after the *prosecutor* gave the jury his personal impressions about the defendant's guilt.  *Id.* at 20.  The relevant inquiry is not solely whether the prosecutor's comments were inappropriate, but whether,

in the context of the entire proceedings, they affected the jury's ability to fairly consider the evidence. *Id.* at 12. The Court held that while the prosecutor's remarks were improper even as a response to the defense counsel's arguments, they did not constitute plain error. *Id.* at 14-15. In contrast, Petitioner argues that the *police officer's* statements violated his due process rights. As noted by the Michigan Court of Appeals, Officer Horn's statement that "I produced my firearm at him, and at that point, believed him to be armed, and figured *if* he was willing to shoot his wife, . . . he would shoot me" was not an opinion as to Petitioner's guilt. (Tr. II, 17.) (emphasis added.) Rather, he explains why he produced his firearm. In the context of the entire proceedings, Officer Horn's statement did not affect the jury's ability to consider the overwhelming evidence of Petitioner's guilt. *See* Section I(A).

Petitioner also argues that MICH. CT. R. 701[4] limits the admissibility of lay witness opinion testimony. Petitioner's federal claim, however, fails because the extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction" for it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions. *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. In this respect, it is recognized that "[w]hen an evidentiary ruling

---

[4] Michigan Court Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512 (citations omitted); *see also Norris*, 146 F.3d at 328-29 (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994)(citation omitted), and courts have defined those violations which violate fundamental fairness "very narrowly," *Bugh*, 329 F.3d at 512 (citation omitted). State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citation omitted). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). As noted above, in the absence of Supreme Court authority holding that the admission of Officer Horn's testimony violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to habeas relief. *See Bugh*, 329 F.3d at 512-13.

## III.    Cumulative Errors

Petitioner also argues that the cumulative effect of the errors in his case violated his federal due process rights. The Michigan Court of Appeals addressed this claim as follows:

> Last, defendant asserts that the cumulative effect of errors in this case denied him a fair trial. In order to reverse on grounds of cumulative error, there must be errors of consequence that are seriously prejudicial to the point that defendant was denied a fair trial. *People v Knapp*, 244 Mich App 361, 387-388; 624 NW2d 227 (2001). Prejudicial error has not been identified in this case and absent the establishment of errors, there can be no cumulative effect of errors meriting reversal. *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

MCOA Op. at *3. The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Thus, it cannot be said that the judgment of the Michigan courts is contrary to any Supreme Court decision

so as to warrant relief under the AEDPA.  *Cf. Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983) (pre-AEDPA case; holding that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair").  Because Petitioner's individual assignments of error would not support habeas relief under the AEDPA, the cumulative effect thereof is likewise insufficient.  *See Baze v. Parker,* 371 F.3d 310, 330 (6th Cir. 2004), *cert. denied,* 544 U.S. 931 (2005); *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  September 22, 2006                      /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).